U.S. Bankruptcy Court
District of Idaho
Filed: September 23, 2004
at 10:00 a.m.
By: JCf

# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| IN RE | ) | |
| | ) | |
| CLINTON ANDRUS and | ) | Case No. 04-00061 |
| BRENDA ANDRUS | ) | |
| | ) | |
| Debtors. | ) | MEMORANDUM OF DECISION |
| | ) | |
| | ) | |

## I.  INTRODUCTION

Chapter 13 debtors Clinton and Brenda Andrus ("Debtors") have asserted

that one of their scheduled creditors and certain other parties violated the

automatic stay of § 362(a)[1] which protected them and the property of their estate.

They seek to recover damages, attorneys' fees and costs, and punitive damages.

This contested matter was tried to the Court on July 1, 2004, and was taken

under advisement upon the conclusion of post-hearing briefing and submissions.

This Decision constitutes the Court's findings of fact[2] and conclusions of law.  Fed.

---

[1]  Unless otherwise indicated, all statutory references are to the Bankruptcy Code,
Title 11 of the U.S. Code.

[2]  All findings that are based on or refer to testimony include the Court's evaluation
(continued...)

MEMORANDUM OF DECISION - 1

AO 72A
(Rev. 8/82)

R. Bankr. P. 9014, 7052.

In one sense, this matter is simple.  Debtors' car was repossessed five weeks after they filed their chapter 13 case.  They had their attorney immediately protest the repossession and, then, they filed motions with this Court seeking relief.  Still, it was four months before their car was returned.  They feel someone should pay for the violations of bankruptcy law that occurred, and they seek relief under § 362(h), which provides:

> (h)    An individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages.

Section 362(h).[3]

In another sense, this case is not so simple.  Determining the identity of all the actors, and clarifying the roles they played, has been difficult.  These determinations are important since each individual or entity that willfully violated the automatic stay is liable to Debtors for actual damages and attorneys' fees, and may be liable for punitive damages.

---

[2](...continued)
of the credibility of the witnesses and determination of the weight to be provided any such testimony.

[3]  Unless otherwise indicated, all statutory references are to the Bankruptcy Code, Title 11 of the U.S. Code.

MEMORANDUM OF DECISION - 2

## II.  BACKGROUND AND FACTS

### A.  The repossession

Late on the evening of February 18, 2004, two men, William J. Hale, Sr.

("Hale") and Robert Jaggers ("Jaggers"), went to Debtors' residence in Mountain

Home, Idaho, in order to repossess Debtors' 1999 Pontiac Grand Am.  They did

not announce their presence.  The front-wheel drive Grand Am was in Debtors'

driveway, facing the garage door.  The men pulled the vehicle into the street to

attach its front-end to their tow truck.  Since the vehicle was locked, the

transmission was not disengaged before the vehicle was pulled into the street.  The

parking brake was on.  The process left noticeable skid marks on Debtors'

driveway.

Once the Grand Am was on the street and ready to be towed, Jaggers went

to the door of the residence and knocked.  His intent was to advise Debtors' that

their car was being repossessed, to ask for a key, and to give Debtors the

opportunity to remove personal possessions from the vehicle before it was taken.

Clinton Andrus spoke with Jaggers at the door.  He advised Jaggers that he

and his wife had filed bankruptcy and that Jaggers therefore could not take the car.

Jaggers concedes Mr. Andrus told him this.  Jaggers also admits that he knew, if

Debtors had indeed filed bankruptcy, he could not lawfully repossess the car.

Jaggers says he asked Mr. Andrus for copies of papers to prove Debtors filed

bankruptcy.  According to Jaggers, instead of producing bankruptcy papers, Mr.

MEMORANDUM OF DECISION - 3

AO 72A
(Rev. 8/82)

Andrus grabbed certain papers regarding the repossession from Jaggers's hand and slammed the door.[4]

Jaggers argues that, had he been shown copies of bankruptcy papers, he would have stopped the repossession. He indicates that asking for proof of filing keeps debtors from falsely claiming they are in a bankruptcy case, halting the repossession, and then hiding their vehicle. He also argues that, since repossessions very often happen at night, as here, there is no real opportunity to independently verify a debtor's claim of filing.[5]

Since no documents were produced, Jaggers and Hale left with the vehicle. They drove to Caldwell, Idaho, about 60 miles away, and unloaded the Grand Am in the back lot of "Cowboy Motors" on Cleveland Boulevard. This was the business that had requested the repossession. *See* Ex. F.

### B. After the repossession

Debtors, through their attorney, immediately protested the repossession and demanded return of the vehicle, starting with a phone call to Cowboy Motors on February 19. Their efforts to resolve the matter over some six weeks proved futile. Their lawyer therefore filed pleadings with this Court in early April seeking relief.

---

[4] Mr. Andrus testified that, after he told Jaggers of the bankruptcy filing, Jaggers said "I don't care" and that Jaggers never asked for any copies. The Court finds it unnecessary to resolve the testimonial conflict because, even under Jaggers' version of events, a stay violation occurred.

[5] To be fully accurate, Jaggers' testimony either made such arguments or provided the basis for those arguments to be later advanced by counsel for Discount Towing, the business that employed Jaggers to effect this repossession. *See* discussion *infra*.

MEMORANDUM OF DECISION - 4

This resulted in a hearing on May 3, 2004, at which the principal of the scheduled secured creditor on the vehicle, an employee representative of Cowboy Motors, and Jaggers appeared in response to Debtors' motion, though none with an attorney.

Debtors' counsel advised that he wanted to amend the pleadings and reschedule the hearing, given concerns over identifying all the responsible parties and determining their relative liability for what occurred.  The Court allowed the hearing to be vacated, subject to renoticing.

In late May, Debtors "renewed" their motion seeking return of the car and damages and sanctions for its post-bankruptcy repossession and extended retention. They scheduled the renewed motion for hearing on July 1.  On June 17, four months after the February 18 repossession, the car was returned to Debtors.

In addition to their concerns about the condition of the car upon its return, Debtors were also unhappy and frustrated about the entire situation, including the fact that they did not have use of their car for an extended period of time.  They therefore continued with this action against all the people and businesses that were – or might have been – involved, seeking damages, costs and attorneys' fees, and punitive damages.  Thus, the hearing on July 1 was held.

### C.  Additional facts and detail about the actors

In addition to the evidence establishing the foregoing facts, evidence was submitted as to the nature and identity of the several businesses involved in the

MEMORANDUM OF DECISION - 5

repossession and the individuals who either owned or were employed by those businesses. In order to resolve the § 362(h) claims presented, findings must be made regarding these issues. The preponderance of the credible evidence establishes the following:

### 1. Jerry Johnson Jr.

Debtors filed their bankruptcy petition on January 9, 2004. *See* Doc. No. 1.[6] Their schedule D (creditors holding secured claims) indicated the secured party on the Grand Am was Jerry Johnson, Jr. ("Johnson").[7] Although Debtors purchased the Grand Am at the business known as Cowboy Motors, located on Cleveland Boulevard in Caldwell, they had been making their payments to Johnson. Johnson's business included buying secured notes on recourse from a number of car lots, including Cowboy Motors, and he had purchased Debtors' contract.[8]

Because Johnson was listed on Debtors' schedules and on the master mailing list required under LBR 1007.1, he received notice of the bankruptcy. *See*

---

[6] The Court takes judicial notice of its files and records. Fed. R. Evid. 201.

[7] While Debtors' schedule D listed Johnson as an individual, the weight of the evidence indicated that the vehicle contract and the secured creditor's interest was acquired by "Jerry Johnson, Jr., Investments I, A Limited Partnership". Debtors recognized the distinction in their motion and related submissions. Johnson is one of the general partners of this limited partnership. *See* Ex. B. He is also the managing partner, and he does not dispute responsibility for the conduct of that business. As discussed further below, he personally participated in many of the events here. For simplicity and brevity, reference is made in this Decision to Johnson, whether referring to the individual or the limited partnership.

[8] Though not entirely clear, it appears that Cowboy Motors may have remained the "lienholder" on the vehicle's certificate of title.

MEMORANDUM OF DECISION - 6

Doc. No. 1.[9]  Notice was also given to Johnson on January 14, through service of

Debtors' motion seeking to establish the amount of Johnson's secured claim under

the chapter 13 plan.  *See* Doc. Nos. 11, 12.  On January 26, 2004, Johnson sent a

letter to Debtors, stating:

> We received your bankruptcy notice.  If you want to reaffirm the cars
> we need to be notified and the payments need to be kept up.
> Otherwise - just drop the cars off at Cowboy Motors.

*See* Ex. D.  Debtors' attorney responded with a letter on February 3, cautioning

Johnson about the existence of the automatic stay.  *See* Ex. E.

### 2.  Discount Towing, Jaggers, Hale and Free

Jaggers regularly works for Discount Towing, and did so in regard to the

repossession of Debtors' car.  Jaggers testified that shortly before February 18 he

received by telephone a "repo order" on Debtors' Grand Am from Cowboy Motors.

In particular, the call was from an individual named Jay Allman.  Allman was a

corporate officer of Cowboy Motors Incorporated ("CMI") for a significant period of

time and, those testifying all agreed, Allman was the day-to-day manager of

Cowboy Motors and effectively ran that business.  The repo order on Debtors' car

was one of three he received from Allman at Cowboy Motors that day.

Discount Towing is an assumed business name of Hale and another

individual, Raymond Free ("Free").  *See* Ex. O.  The business is conducted out of

---

[9]  The Court's record reflects that the Bankruptcy Noticing Center served notice of
filing and the § 341(a) meeting on the parties on the master mailing list on January 14,
2004.

MEMORANDUM OF DECISION - 7

Hale's home in Boise.  The tow truck is kept at Free's residence, a trailer in southeast Boise.

Hale and Free characterize Jaggers as an "independent contractor" or a "subcontractor" and indicate that they do not withhold taxes from amounts paid to Jaggers or provide workers' compensation benefits for him.  Discount Towing pays Jaggers on a "percentage basis" (presumptively a percentage of what Discount Towing charges or receives from the businesses for which it provides towing or repossession services) for the 3 to 6 jobs per week Jaggers performs.  Jaggers uses Discount Towing's truck.  As noted, it was Jaggers who took Allman's call on behalf of Discount Towing.[10]

Despite Hale's and Free's characterization of Jaggers as an independent contractor, the preponderance of the evidence indicates Jaggers is an employee of Discount Towing.  At a minimum, the evidence establishes he was an authorized agent.[11]

### 3.  Cowboy Motors, Inc. and Alaniz Motors, Inc.

Cowboy Motors, the car dealership that sold the Pontiac to Debtors, was an assumed business name of CMI.  CMI was incorporated in May, 2000 by Todd Gerzine.  *See* Ex. A at 1-2.  The annual report forms filed by CMI with the Idaho

---

[10]  Jaggers also attempted to "appear for" Discount Towing at the May 3 hearing. *See* Doc. No. 37

[11]  The post-hearing brief of Discount Towing's counsel concedes that Jaggers was "admittedly an agent of Discount [Towing]." *See* Doc. No. 60 at 1.

MEMORANDUM OF DECISION - 8

Secretary of State reflect that Gerzine was President of CMI and that, in 2001 and 2002, Allman – Gerzine's brother in law – was Vice President. *Id.* at 4-5.

In 2003, Richard Alaniz ("Alaniz") appeared as Vice President in the annual corporate report form, and that form no longer referenced Allman. Alaniz completed and executed the 2003 report form as an officer of CMI. *Id.* at 7. The 2004 annual report reflects no officers other than its President, Gerzine. *Id.* at 8.

In addition to being a Vice President of CMI, Alaniz was a salesman at Cowboy Motors. On February 26, 2004, eight days after the repossession of Debtors' car, Alaniz incorporated Alaniz Motors, Inc. ("AMI"). *See* Ex. M. AMI used 6813 Cleveland Blvd., Caldwell, Idaho as its address in its articles of incorporation. *Id.* This is the same address where Cowboy Motors did business.

Also on February 26, AMI filed a certificate of assumed business name with the Idaho Secretary of State, indicating its business was conducted under the name "Cowboy Motors". *See* Ex. N. Attached to that certificate is a "permission and authorization letter" from CMI to AMI authorizing AMI to use the Cowboy Motors name. *Id.* This letter is dated February 25, and signed by Alaniz, Allman and, allegedly, by Gerzine. *Id.*[12]

Alaniz testified that he formed AMI to purchase CMI's assets and business and operate a used car dealership on that same site. On March 7, 2004, in

---

[12] This and a number of other documents bear Gerzine's purported signature. Gerzine denied signing several of the documents. The suggestion is that Allman often signed Gerzine's name.

MEMORANDUM OF DECISION - 9

furtherance of that goal, AMI entered into a lease of the real property on Cleveland

Boulevard where Cowboy Motors conducted business, for a term of five years, with

the lease term running from April 1, 2004 through March 31, 2009. *See* Ex. P.

Allman signed that document as "manager" of Steelhead Investments LLC, the

asserted landlord. *Id.*

In addition, an "Attachment 1 to Bill of Sale" was signed, by Allman on

behalf of CMI,[13] on March 15, 2004. *Id.*[14] It appears to reflect a transfer from CMI

to AMI of virtually all the dealership's assets. Alaniz testified that he paid

$5,000.00 under this agreement, giving that money to Allman.[15] Gerzine never

saw any of these funds. Allman, according to the testimony, left Idaho for Colorado

sometime in late April, 2004.

Despite what these documents indicate, Alaniz testified that he did not

commence business or take over operations at the dealership until May 4, 2004,

the date he obtained a car dealer's license under his own name. Alaniz asserts that

CMI was still doing business after February 25 (the date CMI assigned use of its

---

[13] Allman signed this document for Gerzine under an alleged power of attorney. *Id.*

[14] The bill of sale referred to in this "attachment", Ex. P, was never produced. In fact, the several responding parties failed to comply with the command to produce business records and documents contained in Debtors' duly issued hearing subpoenas. *See* Doc. Nos. 49-54.

[15] Alaniz knew that his purchase agreement was with CMI, not Allman. He stated, however, that "everyone" treated Allman as CMI's owner, inferentially explaining why he gave the money to Allman. Still, Alaniz knew that Gerzine was CMI's president and owner, having signed the 2003 annual report for the corporation which indicated no officers other than himself and Gerzine. *See* Ex. A at 7.

MEMORANDUM OF DECISION - 10

trade name to AMI), and after March 15 (the date of the attachment to the bill of

sale), and through May 4, and that throughout these times he was but a salesman

for Cowboy Motors.[16]

Gerzine knew that the business was being sold to Alaniz or to Alaniz'

corporation. However, he had no knowledge of the terms of the transaction, did

not review or execute any documents, and certainly never saw the sales proceeds.

Neither Allman, nor Allaniz (whether as CMI's employee or as the prospective

buyer), kept Gerzine advised. Nor did Gerzine investigate or keep himself advised.

### D.   Retention and, ultimately, surrender of the vehicle

Following the repossession of Debtors' car on February 18, Debtors' counsel

had a February 19 phone conversation with Allman, advising him of the violation

of the automatic stay and demanding return of the vehicle.[17] On February 26,

Debtors' counsel sent a demand letter to CMI, addressed to the attention of Allman

as general manager. *See* Ex. G. This letter clearly and pointedly laid out the

---

[16] Gerzine owned CMI, either solely or with his brother in law Allman, though Gerzine could not say with certainty what ownership, if any, Allman had. Gerzine was also apparently the sole officer of CMI during this period in 2004, at least based on the limited evidence presented. Johnson testified that Gerzine was "totally inactive" in the Cowboy Motors business, and the accuracy of this characterization is borne out by the testimony of all the witnesses. It appears that, from March 15 to late April, Allman may have been running the business, though Alaniz was certainly there and, at a minimum, attempting to complete his acquisition of the operation. Alaniz contends that, during the week or so after Allman left the state and before Alaniz admits to assuming operations, Cowboy Motors sold no cars.

[17] Notwithstanding the communication received previously from Johnson as the creditor secured in the vehicle, Debtors' attention may have been turned toward Cowboy Motors or CMI through the repossession paperwork. *See, e.g.,* Ex. F.

MEMORANDUM OF DECISION - 11

existence of a stay violation, and indicated the situation would only get worse
unless the car was immediately returned.  Debtors threatened an action for actual
damages, attorneys' fees, and $10,000.00 in punitive damages.

Nevertheless, from and after February 19 and continuing through all of
March and April, the car remained on the Cowboy Motors' lot.  Allman, Johnson
and Alaniz had a number of conversations about Debtors' bankruptcy filing and
about Debtors' attorney's demands for the car's return and threats of a lawsuit.  This
led them to wonder, for example, whether the car could be effectively transferred if
sold.  (For much of this time, the car was being offered for sale by Cowboy Motors.)
While these concerns led them to scrap a proposed sale of the car, they still did not
return the car.  Nor did they consult with legal counsel to evaluate Debtors'
counsel's demands.

Johnson, Jaggers, and Alaniz appeared at the May 3 hearing.  The Court
commented on the seriousness of the matter and the need for these three
individuals to obtain prompt legal advice.  As mentioned earlier, the hearing was
adjourned at Debtors' request.  On May 26, still without any resolution, Debtors
renewed their motion and set a July 1 hearing.  *See* Doc. Nos. 41, 42.

The rescheduled hearing apparently motivated a response that Debtors'
demands and the Court's comments could not.  On June 14, counsel was retained
for Discount Towing, Alaniz and AMI.  The following day, that attorney left a
message for Debtors' counsel agreeing to surrender the vehicle.  The agreement

MEMORANDUM OF DECISION - 12

was confirmed and the car picked up on June 17.

After recovering the Grand Am, Debtors noted the antenna and oil cap were broken or missing, and the floor mats were also gone. The cost for replacement, according to Debtors' uncontradicted testimony, was $30.80. Ex. L. They were also concerned about the possibility of damage to the car from the manner in which it had been pulled into the street from the driveway during the repossession. Debtors had the alignment and wheel balance checked. This cost $19.50, and Debtors found no other damage despite what they feared from the tire marks left on their driveway. Ex. K.

Debtors lost the use of the Grand Am for about 4 months. They assert, without effective dispute, that this resulted in an injury of $200.00 per month given their need to use a less fuel-efficient vehicle to get to work.

## III.   DISCUSSION AND DISPOSITION

### A.   The scope of the stay, its violation, and the consequences

Certain fundamental propositions control the Court's analysis. They start with the language of the Bankruptcy Code.

Section 362(a) automatically stays or enjoins, immediately upon the filing of the bankruptcy petition and without the need for any express order by the Court, any entity's attempt or act "to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." *See* § 362(a)(3). It also stays "any act to . . . enforce any lien against property of the

MEMORANDUM OF DECISION - 13

estate." *See* § 362(a)(4).  It also stays "any act to collect, assess, or recover a claim against the debtor that arose before the commencement [of the bankruptcy]." *See* § 362(a)(6).

Section 362(h) provides a remedy for individual's harmed by a violation of the § 362(a) stay.  As set out above, it provides that "an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and in appropriate circumstances, may recover punitive damages."

The Ninth Circuit recently reaffirmed that "[t]he scope of protections embodied in the automatic stay is quite broad, and serves as one of the most important protections in bankruptcy law." *Eskanos & Adler, P.C. v. Leetien*, 309 F.3d 1210, 1214 (9th Cir. 2002).[18]  And this Court previously noted that "the stay is one of the fundamental debtor protections under the Code, and that it 'stops all collection efforts.'" *In re Aughenbaugh*, 02.4 I.B.C.R. 157, 158 (Bankr. D. Idaho 2002) (quoting *Franchise Tax Bd. v. Roberts (In re Roberts)*, 175 B.R. 339, 343 (9th Cir. BAP 1994)).

> The reach of the automatic stay is broad.  It prohibits any act taken against the debtor or to recover a claim against the debtor.  The stay requires the creditor to maintain the status quo ante and to

---

[18] *Eskanos & Adler* concerned a collection action which, though filed pre-petition and allegedly not being pursued after filing, remained an active action that the creditor refused to dismiss.  The court held that "[c]onsistent with the plain and unambiguous meaning of the statute, and consonant with Congressional intent, we hold that § 362(a)(1) imposes an affirmative duty to discontinue post-petition collection actions."  309 F.3d at 1215.

MEMORANDUM OF DECISION - 14

remediate acts taken in ignorance of the stay.

*Id.* (quoting *Roberts*); *see also In re Wiersma*, 03.1 I.B.C.R. 42, 44 (Bankr. D. Idaho

2003) ("Respect by all involved for the automatic stay is critical to the fair and

effective functioning of the reorganization process.").

Given these policies and the broad sweep of the language § 362(a)(1)

through (a)(8), it is not surprising that there are many ways in which a creditor or

party may violate the stay.  Certainly seizing or attempting to seize property of the

debtor or the debtor's estate is one type of violation.  *See, e.g., Wiersma*, 03.1

I.B.C.R. at 43-44 (bank's unauthorized taking and application of debtor's funds in

payment of bank's claims); *Aughenbaugh*, 02.4 I.B.C.R. at 158-60 (garnishment); *In

re Meeks*, 260 B.R. 46 (Bankr. M.D. Fla. 2000) (vehicle repossession); *In re

Diviney*, 225 B.R. 762 (10th Cir. BAP 1998) (vehicle repossession); *Progressive

Motors, Inc. v. Frazier*, 220 B.R. 476, 477-78 (D. Utah 1998) (vehicle repossession).

Another violation is the failure of a party in possession of property of the

estate,[19] even if possession was gained pre-petition, to immediately return the

property to the debtor upon becoming aware of the bankruptcy filing:

---

[19] The Grand Am was undoubtedly property of Debtors' bankruptcy estate:

Property of the estate includes "all legal or equitable interests of the debtor in
property as of the commencement of the case" wherever located and by
whomever held.  11 U.S.C. § 541(a)(1).  This provision has been interpreted
by none other than the United States Supreme Court to encompass property
seized prior to the filing of a petition for reorganization.  *U.S. v. Whiting Pools,
Inc.*, 462 U.S. 198, 209 (1983).

*Johnson*, 262 B.R. 831, 847, 01.2 I.B.C.R. 72, 77.

MEMORANDUM OF DECISION - 15

> This Court has interpreted th[e] language [of § 362(a)(3)[20]] to require that
> a party in possession of property of a Chapter 13 debtor return such
> property to the debtor upon learning of the bankruptcy case, or risk
> violation of the automatic stay. *In re Johnson*, 262 B.R. 831, 847-48,
> 01.2 I.B.C.R. 72, 77-78 (Bankr. D. Idaho 2001) (finding a stay violation
> under circumstances very similar to the case at bar); *see also California
> Employment Dev. Dep't v. Taxel (In re Del Mission Ltd.)*, 98 F.3d 1147,
> 1151 (9th Cir. 1996) ("We now . . . hold that the knowing retention of
> estate property violates the automatic stay of § 362(a)(3)").    More
> specifically, those in possession of a debtor's property, upon filing, must
> "take appropriate affirmative steps to ensure return of" such property to
> the debtor. *Johnson*, 262 B.R. at 848, 01.2 I.B.C.R. at 78.

*Jacobson*, 03.2 I.B.C.R. 119, 120 (Bankr. D. Idaho 2003). *See also* § 542(a)

(requiring that an "entity . . . in possession, custody, or control, during the case, of

property [of the estate] shall deliver to the trustee, and account for, such

property[.]")[21]

Once the creditor or actor learns of the bankruptcy filing, any actions

intentionally taken thereafter are "willful" within the contemplation of § 362(h).

*Eskanos & Adler*, 309 F.3d at 1215 ("A willful violation is satisfied if a party knew

of the automatic stay, and its actions in violation of the stay were intentional.")

(citing *Pinkstaff v. United States (In re Pinkstaff)*, 974 F.2d 113, 115 (9th Cir. 1992));

---

[20] As noted previously, this provision prohibits any attempt to "exercise control
over property of the estate."

[21] *See also Diviney*, 225 B.R. at 776 (Even "an innocent stay violation can become
willful if the creditor fails to remedy the violation after receiving notice of the stay.") (citing,
*inter alia*, *Abrams v. Southwest Leasing & Rental, Inc. (In re Abrams)*, 127 B.R. 239, 241-44
(9th Cir. BAP 1991)). *Accord Boggan v. Hoff Ford (In re Boggan)*, 251 B.R. 95, 100-01, and
102-03 (9th Cir. BAP 2000) (concurring opinion) (holding that even creditors with putative
*possessory* lien rights in property obtained prior to debtor's bankruptcy filing must promptly
seek bankruptcy court resolution after filing to avoid liability for stay violation due to
continued retention).

MEMORANDUM OF DECISION - 16

AO 72A
(Rev. 8/82)

*Jacobson*, 03.2 I.B.C.R. at 121 (citations omitted).[22] It is, thus, the intent to act

while on notice of the pendency of the bankruptcy case, not a specific intent to

violate the stay, that is material. *Associated Credit Servs., Inc. v. Campion (In re*

*Campion)*, 294 B.R. 313 (9th Cir. BAP 2003) states:

> There need be no proof of specific intent to violate the stay or to injure.
> To the contrary, a good faith belief that the stay is not being violated "is
> not relevant to whether the act was 'willful' or whether compensation
> must be awarded."

294 B.R. at 316 (footnote and citations omitted); *see also Jacobson*, 03.2 I.B.C.R. at

121 ("Specific intent to violate the stay is not a required element in finding a willful

violation.") (citing *Goichman v. Bloom (In re Bloom)*, 875 F.2d 224 (9th Cir.

1989)); *Aughenbaugh*, 02.4 I.B.C.R. at 163.

If a willful violation is established, the Court must determine on the

evidence what "actual damages" were suffered. *Jacobson*, 03.2 I.B.C.R. at 121

("The amount of any actual damages sought pursuant to § 362(h) must be

proved."). The burden of proof as to damages is placed on the debtor. *Id.* Under

§ 362(h), a debtor need not prove actual damages apart from attorneys' fees, which

are alone recoverable. *Jacobson*, 03.2 I.B.C.R. at 121 (citing *Eskanos & Adler*, 309

---

[22]  Knowledge that there is a bankruptcy case is sufficient to impart knowledge that
there is an automatic stay. *See, e.g., In re Isom*, No. 97-45212, 1998 WL 173204 (Bankr.
D. Minn. April 8, 1998) (rejecting creditor's argument that, despite receiving notice of
bankruptcy, creditor "didn't understand the ramifications of that filing (*i.e.*, he didn't know
about the automatic stay)" and finding that "ignorance of the law is no excuse" and that all
that is required for a willful violation is "a deliberate act made with knowledge of the filing
of the petition"). *Id.* at *3.

MEMORANDUM OF DECISION - 17

F.3d at 1215-16).[23]  The statute also allows for assessment of punitive damages "in appropriate circumstances."

These are the authorities that will be applied to the conduct proven by the evidence.  The focus turns now to the specific acts, and failures to act, of the nondebtor parties.

### B.  Violations of the stay in this case

#### 1.  When the repossession was ordered

##### a.  Johnson's liability

On February 18, when the repossession was ordered by Allman for and on behalf of CMI, CMI had no direct notice of the existence of Debtors' bankruptcy. Johnson, however, clearly had notice of the bankruptcy as evidenced by the pleadings of record, Johnson's January 26 letter to Debtors, and the February 3 reply from Debtors' counsel.

There is no direct evidence that Johnson personally instructed CMI to effect a repossession of Debtors' Pontiac subsequent to receiving these several notices regarding the bankruptcy.  Johnson testified that he made no telephone call or

---

[23]  Debtors here at one point indicated a desire to recover emotional distress damages under § 362(h).  *See, e.g.*, Doc. No. 27 at 2 (alleging at least $1,500.00 of such damages).  Their ability to do so was, at the time of filing this pleading, quite constrained. *See Stinson v. Bi-Rite Rest. Supply, Inc. (In re Stinson)*, 295 B.R. 109, 122 (9th Cir. BAP 2003) (holding that "significant economic loss" caused by the violation of the stay was prerequisite to seeking emotional distress damages).  In light of *Stinson*, Debtors withdrew the request.  *See* Doc. No. 45 at 5.  On May 18, 2004, the Ninth Circuit ruled that "actual damages" as used in § 362(h) refers to economic harm alone and that emotional distress damages are not available.  *Dawson v. Washington Mut. Bank, FA (In re Dawson)*, 367 F.3d 1174, 1178-81 (9th Cir. 2004).

MEMORANDUM OF DECISION - 18

similar request.  However, Johnson did provide CMI a weekly "delinquency report"
by facsimile, and this report showed Debtors as among several consumers who
were behind on their car payments.[24]  In the ordinary course of Johnson's business,
these reports lead to the issuance of "repo orders" by dealers, including Cowboy
Motors.

In short, something must have caused the repo order on Debtors' Grand Am
to be issued.  Johnson denies directing Allman to repossess, and even states he was
"confused" when he learned it had happened.  Allman did not testify.  Given the
purchase of the contract by Johnson, the Court finds it unlikely that Cowboy Motors
had independent motivation to determine that Debtors were in default and start a
repossession.  Under the evidence, the cause of the repossession was the
delinquency report Johnson issued and delivered.

Johnson had a duty of care once he was informed of the pending
bankruptcy, something Debtors' counsel emphasized in the February 3 letter.  He
failed to exercise appropriate care.  Even if the delinquency report he sent to
Cowboy Motors was automatically generated, it is not sufficient to blame the error
on a computer or an internal business process.  That Johnson continued to generate
delinquency reports, which he had reason to know could and would be used to
trigger repossessions, without removing known bankruptcy debtors from those

_____

[24] Johnson does this as an ordinary part of his business, and the reports go not just
to CMI but also to other dealers from which he purchased contracts.

MEMORANDUM OF DECISION - 19

reports, was wrong.  Carelessness or claimed inadvertence is no defense.

*Campion* addressed a similar sort of situation.  There, the creditor argued

that the stay violation was "committed by the computer" which had failed to "link"

the debtor's name on an internal report.  This failure resulted in initiation of

garnishment proceedings even though the creditor knew that the debtor had filed a

bankruptcy.  The creditor claimed to lack willful intent, contending that its "internal

safeguards for preventing stay violations" were either compromised or not up to the

task.  294 B.R. at 315-17.  Its arguments were unavailing:

> Nor is it any excuse that [the creditor] was betrayed by its
> computer.  A creditor's "internal disorder does not excuse it from
> violating the automatic stay." *Eskanos & Adler*, 309 F.3d at 1215.  The
> computer tale is one of internal disorder.
>
> Moreover, stay violations attributable to a computer are not
> "'inadvertent' . . . acts taken without knowledge of the existence of the
> stay." *Franchise Tax Board v. Roberts (In re Roberts)*, 175 B.R. 339, 344
> (9th Cir. BAP 1994).
>
> We perceive no difference as a practical matter between a
> computer program that does not perform tasks accurately and a clerical
> employee who does not perform tasks accurately.  In either event, the
> employer bears the risks of the consequences.

*Id.* at 317.[25]

Johnson had to pay attention to the existence of the stay.  He received the

---

[25] In *Eskanos & Adler*, the creditor argued in part that its failure to promptly dismiss
the state court collection action once bankruptcy had been filed "was due to problems with
its process server."  309 F.3d at 1215.  The court rejected the argument finding that
"Eskanos' internal disorder does not excuse it from complying with the automatic stay." *Id.*
Thus a creditor's liability for willful violation extends to disorder related to that creditor's
agents.

MEMORANDUM OF DECISION - 20

traditional bankruptcy notice as well as additional pleadings from Debtors

specifically addressing his claims. He knew of the case and had, in fact,

communicated with Debtors. He therefore was under an obligation to ensure that

collection activities were not commenced. He failed to meet that obligation. His

issuance of the delinquency report is found to have caused the initiation of the repo

order and repossession process.[26] The Court concludes Johnson willfully violated

the stay of § 362(a) in this regard.[27]

### 2.  When the repossession took place

#### a.  Liability of Discount Towing, Hale and Free

Hale, one of the owners of Discount Towing, and Jaggers actually appeared

at Debtors' residence late at night on February 18 to effect the repossession. In the

process of doing so, they learned that Debtors claimed to have filed for bankruptcy

relief. They proceeded, even in the face of that information, to complete the

repossession, unwilling to cancel the seizure on the oral representation alone.

---

[26]  Under the evidence, Johnson's conduct here is not as plausibly defensible as that of the creditor in *Campion*. There, the creditor apparently *tried* to follow a process whereby collection activities would be ceased against known bankruptcy debtors. There was no evidence here of similar efforts made by Johnson. Of course, even if there were evidence of such processes, *Campion* and *Eskanos & Adler* make clear that Johnson's violation of the stay would not be excusable.

[27]  To the extent Johnson argues that CMI independently called for the repossession, and he should not be liable for this particular aspect of the stay violation, the argument fails. First, it is not borne out by the evidence. Second, a principal can ratify the improper acts of an agent by taking some action to affirm the conduct after gaining knowledge of the material facts. *In re Sumpter*, 171 B.R. 835, 843 (Bankr. N.D. Ill. 1994). Sufficient ratifying conduct, with knowledge of CMI's and Discount Towing's conduct and Debtors' bankruptcy, exists here.

MEMORANDUM OF DECISION - 21

Fundamentally, they assumed the risk that they were wrong and Debtors were right.

The argument that their conduct was appropriate in the absence of Debtors providing corroborative documents is rejected. Certainly debtors' counsel could, and perhaps should, provide their clients with a conformed copy of a filed petition for use in circumstances such as this. Such a practice undoubtedly would reduce the number of occasions where the creditor would elect to proceed with seizure of collateral. But the ability of the debtor to immediately corroborate his assertion regarding filing is not prerequisite to obtaining the protection of the Code or the benefit of § 362(h). Debtors are not absolutely required to "prove" a bankruptcy filing to the satisfaction of skeptical creditors by any particular type or weight of evidence.[28]

The desire to avoid being "scammed" by a debtor falsely claiming to have filed is understandable. But a creditor must carefully balance the potential benefits against the clear and significant risks if the representation proves true. In *Brockington v. The Citizens & S. Nat'l Bank of South Carolina (In re Brockington)*, 129 B.R. 68 (Bankr. D.S.C. 1991), the court reached a similar conclusion, stating:

---

[28] As with all matters of stay violation, the facts are important. For example, a debtor who is shown to have previously falsely told a creditor that he has filed a bankruptcy may find it harder to hold the creditor liable under § 362(h), especially for punitive damages, for disbelieving a subsequent uncorroborated representation. *Accord Campion*, 294 B.R. at 318 ("Sympathetic facts may be used to avert punitive damages and, in view of the trial judge's discretion over calculation of actual damage awards, may also figure into the calculus of actual damages. *McHenry*, 179 B.R. at 168-69."). That is not the sort of situation presented here.

MEMORANDUM OF DECISION - 22

A creditor or its agent who disregards the statement of a debtor, even if uncorroborated, that a filing has occurred does not always proceed with impunity. Continuing the repossession is a risk which many may wish to take, as individuals about to involuntarily lose possession of their property often may make false statements or misrepresentations, including that of an existing bankruptcy filing, to thwart or hinder such loss. On the other hand if the debtor is correct, a creditor or its agent cannot deny having been forewarned by one who should best know, the debtor itself.

This Court concludes and so rules that disbelief of a debtor's filing because his or her statement is unaccompanied by other proof or corroboration is no defense to a willful violation of the stay. *In re Wariner*, 16 B.R. 216 (Bankr. N.D. Texas 1981); *In re Weiss*, 108 B.R. 570 (Bankr. S.D. W. Va. 1989).

*Id.* at 70-71; *see also Diviney*, 225 B.R. at 775-76 (finding oral notice of bankruptcy

sufficient predicate for willful violation); *Progressive Motors*, 220 B.R. at 477-79

(affirming bankruptcy court finding of willful violation in repossession conducted

after debtor orally advised creditor of bankruptcy but was unable to provide

confirmation).[29]

Thus, the repossession of the Pontiac after being provided oral notice by Mr.

Andrus that Debtors had filed for bankruptcy relief is found to be a willful violation

of the stay.

Debtors did not seek to hold Jaggers personally liable for the violation under

§ 362(h). *See, e.g.*, Doc. No. 41. They do seek relief against Discount Towing,

---

[29] In *Brockington*, the court indicated the "prudent policy" would be for the creditor "to temporarily stop, confirm, then proceed if authorized" (*i.e.*, if the absence of a bankruptcy filing is verified). 129 B.R. at 71. Certainly an attempt to confirm or verify the existence of a filing is a reasonable alternative, particularly during business hours, or even at other times if the creditor can get to a computer with an Internet connection and access bankruptcy court records.

MEMORANDUM OF DECISION - 23

Hale and Free. *Id.*

The Court concludes that Jaggers was an employee of Discount Towing, and that Discount Towing is responsible and liable for his conduct. However, even if there were legitimate debate on this point, there is no disagreement that Jaggers was an agent of Discount Towing and conducting the repossession on its behalf. That is sufficient basis for Discount Towing's § 362(h) liability. *See Eskanos & Adler*, 309 F.3d at 1212-13, 1215 (rejecting collection attorneys' arguments that violations were only those of its process server); *see also Jacobson*, 03.2 I.B.C.R. at 120-21 (holding that creditor, sheriff, and agent storing property for creditor and sheriff, were liable under § 362(h)); *Sumpter*, 171 B.R. at 843. Furthermore, Hale was personally present with Jaggers, observed the events, and assisted in repossessing the car. Hale's liability under § 362(h) is therefore direct.

Hale and Free jointly do business under the trade or business name of Discount Towing. Based on the evidence, the Court concludes this is a general partnership, and Free is liable for the acts of his partner, Hale, and those of the partnership's employee and/or agent, Jaggers. *See* I.C. § 53-3-306(a) (stating that, with some exceptions not relevant here, "all partners are liable jointly and severally for all obligations of the partnership unless otherwise agreed by the claimant or provided by law.").

MEMORANDUM OF DECISION - 24

AO 72A
(Rev. 8/82)

### 3.  After the repossession (February 19 to February 26)

#### a.  CMI's Liability

CMI held the car after the repossession, even in the face of Debtors'

counsel's demands for the return of the vehicle made the morning after it was

repossessed.  The authorities, discussed at length above make clear that the stay

was violated by CMI's retention of the repossessed vehicle following notice of

Debtors' bankruptcy filing.  Furthermore, there was a duty to return the property of

the estate "to remediate acts taken in ignorance of the stay." *Johnson*, 262 B.R. at

847 (quoting *Roberts*, 175 B.R. at 343).  Creditors must affirmatively act "to halt or

reverse" improper collection actions "and, thereby, maintain, or restore, the status

quo as it existed at the time of the filing of the bankruptcy petition." *Id.* at 848

(quoting *In re Banks*, 253 B.R. 25, 30-31 (Bankr. E.D. Mich. 2000)) (other citations

omitted).

While Debtors' initial post-repossession communications were with Allman,

CMI is ultimately responsible for the conduct of Allman as its employee.  Therefore,

CMI is liable under § 362(h) for continuing to hold the property and for failing to

surrender it.

#### b.  Gerzine's liability

The Court appreciates that, under the weight of the present evidence, CMI

may be a defunct entity.  Certainly nothing affirmatively establishes it has assets

other than those sold to AMI.  In fact, nothing in the evidence indicates this is a

MEMORANDUM OF DECISION - 25

bona fide corporation at all, other than the fact it once filed articles of
incorporation and annual reports.

Debtors recognize that CMI may not be able to respond to a judgment.
There is thus some discussion in Debtors' briefing about potential liability of
Gerzine individually. *See, e.g.*, Doc. No. 58 at 35.[30]  But while it is clear that
Gerzine neglected his corporation, in virtually every regard, and allowed his
brother in law full control, the motion before the Court is one under § 362(h), and
it is brought not against Gerzine individually but, rather, against CMI. *See* Doc.
Nos. 27, 41.  Debtors did not allege or try to prove a case for piercing the
corporation and establishing Gerzine's personal liability for the conduct of CMI.

The Court finds it hard to feel very sorry for Gerzine.  His problems are of
his own making and a result of his own neglect.  But even though CMI is liable for
holding the vehicle and willfully violating the stay during this period, Gerzine is
not, on this record, found directly liable personally under § 362(h).

### c.  Johnson's liability

Johnson, the creditor for whose benefit the car was repossessed, was actively
communicating with Cowboy Motors during this time.  Not only was he aware of
the bankruptcy, the totality of the evidence indicates he was involved in the
decision whether the car would or would not be returned.  Johnson is therefore

---

[30]  Debtors argue, for example, that the Court should award damages, fees and costs
against Gerzine "for failing to observe proper corporate formalities" and to find that the sale
of assets from CMI to AMI is void. *Id.* These matters were not presented under the
pleadings or tried and are not entertained by the Court.

MEMORANDUM OF DECISION - 26

found also liable for willful violation of the stay by reason of the continued

retention of the car during this period of time and by virtue of his failure to

remediate or correct what was by then a known stay violation.

### 4. After the repossession (February 26 to June 17)

#### a. CMI and Johnson's liability

Continued possession of the Grand Am violated the stay. For the same

reasons as set out previously, the continued possession was willful, *i.e.*, intentional

conduct while having knowledge of the bankruptcy, on the part of CMI and

Johnson.

#### b. AMI's liability

The Court further concludes AMI also willfully violated the stay through the

continued retention of the vehicle during at least a portion of the post-repossession,

pre-return period.

On February 26, AMI was incorporated and filed its certificate of assumed

business name with the Secretary of State indicating it was doing business as

Cowboy Motors. Exs. M, N. On March 7, AMI entered into a lease of the business

premises, effective from April 1, 2004 through March, 2009. Ex. P. Debtors point

to this, and Alaniz' close involvement with Cowboy Motors both before and after

AMI was incorporated, as proof of AMI's active participation. In general, the Court

agrees.

However, Alaniz testified that AMI did not actually take over the operation

MEMORANDUM OF DECISION - 27

and conduct business until May 4. He explains that, though AMI had the corporate

structure, bill of sale, and assignment of the Cowboy Motors' business name, it

needed a dealer's license and a dealer bond in order to conduct business. Though

the bond was obtained in April, Alaniz testified the license was not obtained until

May 4. Alaniz' testimony was not effectively impeached, and the Court cannot find

by a preponderance of the evidence that AMI took control earlier than May 4.

Nevertheless, Alaniz was clearly aware of the dispute and the issues

regarding the Grand Am and Debtors' bankruptcy filing from essentially the day

after the car was repossessed. The Grand Am was at all times on the Cowboy

Motors lot. Even accepting Alaniz' argument that CMI was in control up to May 4,

from and after May 4 AMI was in control of property it knew belonged to a

bankruptcy estate.[31] AMI retained the car after May 4, and refused to deliver it as

Debtors demanded until the middle of June. This was intentional conduct, with

knowledge of the bankruptcy, and therefore willful.

Alaniz was in Court and heard the warnings of the Court on May 3, but did

not heed them. He neglected to obtain good legal advice or remedy the situation

after May 4, when AMI gained control over the disposition of the vehicle. AMI is

found liable under § 362(h) for willful violation of the stay.

---

[31] It is certainly also worth noting that Alaniz appeared before this Court at the first
§ 362(h) hearing on May 3 on behalf of Cowboy Motors. *See* Doc. No. 37.

MEMORANDUM OF DECISION - 28

## C.  Damages

### 1.  Actual property damages

The Court is required to award actual damages suffered by reason of a stay

violation.  *See* § 362(h) ("individual injured . . . *shall* recover actual damages").

#### a.  Discount Towing

Discount Towing, Hale and Free violated the stay in a rather short and

discrete period of time, delivering the Grand Am to Cowboy Motors within a day.

But some of Debtors' actual damages attend their conduct, for example, the cost of

checking for alignment or other damage due to the manner in which the

repossession occurred.  Though the amount is small, only $19.50, it is adequately

proven.  The Court cannot find, however, that Discount Towing, Hale or Free are

liable for the "loss of use" damages, since they relinquished possession of the

vehicle by February 19.

#### b.  Johnson

Johnson's violations included setting the repossession in motion and refusing

to return the vehicle in the face of proper demand.  He is found liable for the total

personal property damages of $50.30 and the loss of use damages of $800.00.

#### c.  AMI

AMI is liable for $300.00 of Debtors' loss of use damages, given its control

over the vehicle after May 4 and before return on June 17 (1.5 months x

$200.00/month).  It will also be found jointly liable for $30.80 of personal property

MEMORANDUM OF DECISION - 29

damage since the evidence is not clear as to when the antenna, mats and oil cap were damaged or taken.

### d.  CMI

CMI is liable for Debtors' personal property damages of both $19.50 and $30.80 given the initiation of the repo order and its responsibility for the conduct of its agent, Discount Towing.  In addition, CMI is liable for all but $300.00 of Debtors' loss of use damages given the continued retention of the property of the estate following the repossession.  Thus, CMI is liable for $550.30 in actual damages.

### 2.  Attorneys' fees and costs

Debtors' counsel claims fees of $7,380.00 and costs of $710.40 for a total of $8,090.40 in pursuing this matter.  *See* Doc. No. 65 (amending Doc. No. 57).  No objection has been filed to counsel's affidavits of fees and costs.

The fees and costs are high.  But the conduct of all the responding parties required a significant investment of time and effort.  Not only was there obdurate refusal to return the car after the existence of the bankruptcy was verified and the error of the repossession was made clear, the responding parties also failed to obtain legal counsel for an extended period, even after the Court strongly cautioned them to do so.  In the end, the defense of the matter was fundamentally an exercise in finger-pointing and blame-shifting.  The problem facing Debtors in finding the responsible parties was complicated by this litigation strategy, and by

MEMORANDUM OF DECISION - 30

the convoluted business forms and transactions described at length above.  The responding parties therefore have little room to complain about the amount of Debtors' counsel's fees and costs.

Still, the Court must independently evaluate the request and determine that the fees asserted are reasonable.  *Aughenbaugh*, 02.4 I.B.C.R. at 163 (citing *Beard v. Walsh (In re Walsh)*, 219 B.R. 873, 878 (9th Cir. BAP 1998)).  It finds that, in several regards, Debtors' counsel spent excessive time given the matters at issue.  This was particularly true in regard to the last round of briefing.  There Debtors' counsel went too far afield in the various legal theories and authorities researched and addressed, and the Court finds an unreasonable amount of time was invested.  The time entries between July 10 and 12 amount to 13.7 hours at a rate of $150.00 for a $2,055.00 charge for this briefing alone.  *See* Doc. No. 57, Ex. A at 11.

In evaluating the entire record, and in considering the fee affidavit and the entries of time and services detailed therein, the Court will reduce the fees awarded by $1,500.00.  This results in allowed and awarded fees of $5,880.00 plus costs of $710.40, for a total of 6,590.40.[32]

Given the nature of the defenses raised by all the responding parties, the Court concludes that payment of these fees and costs should be the joint and several obligation of Johnson, CMI, AMI, and Discount Towing, Hale and Free.

---

[32]  The Court had indicated at the May 3 hearing that Cowboy Motors would be sanctioned $200.00.  *See* Doc. No. 37.  The Court has considered that amount in establishing damages in this Decision, and it is no longer a separate award.

MEMORANDUM OF DECISION - 31

*Accord Jacobson*, 03.2 I.B.C.R. at 121 (finding that "[a]ll the offenders played a role in [a] lamentable series of events" justifying an award of attorneys' fees and costs as a joint and several obligation, perhaps deterring "others who act in concert to violate the stay").

### 3. Punitive damages

Debtors have asserted throughout their pleadings and briefing a request for punitive damages in the amount of $10,000.00. *See* Doc. Nos. 27, 28, 41, 45, 58.

The Court may award punitive damages "in appropriate circumstances". Section 362(h). Case law helps define such circumstances. *Wiersma* noted that punitive damages may be awarded "if there has been a reckless or callous disregard of the law." 03.1 I.B.C.R. at 44 (citing *Bloom*, 875 F.2d at 228). Both *Wiersma* and *Aughenbaugh* recognized that, under *Ramirez v. Fuselier (In re Ramirez)*, 183 B.R. 583, 590 (9th Cir. BAP 1995), punitive damages are proper if the conduct was "malicious, wanton or oppressive." *Wiersma*, 03.1 I.B.C.R. at 44; *Aughenbaugh*, 02.4 I.B.C.R. at 163. *See also Stinson*, 295 B.R. at 122 (requiring such a finding or a finding of "egregious, intentional misconduct").

In imposing punitive damages, there is an element of deterrence. The award serves to dissuade the actor(s) from repeating the conduct, and operates to caution others not to engage in similar behavior. *Accord Wiersma*, 03.1 I.B.C.R. at 44 (award operated, *inter alia*, "to discourage the [creditor] and others from future wanton violations of the Code"). Thus, the award should be sufficient to serve

MEMORANDUM OF DECISION - 32

these purposes.

There is also a question of proportionality. In *Progressive Motors*, an appellate court analyzed the bankruptcy court's imposition of punitive damages of $20,000.00 in a car repossession case where actual damages were $3,400.00. 220 B.R. at 478-79. Considering the question under *BMW of N. Am. v. Gore*, 517 U.S. 559 (1996), the court concluded the award was not excessive. *Id.*[33]

In *Wiersma*, the "self-help" engaged in by the creditor, under which the debtor's funds of approximately $10,872.00 were improperly seized and diverted to payment of the creditor's claim, was sufficient to support punitive damages of $32,346.00, a figure three times the amount of the check. 03.1 I.B.C.R. at 44. In *Aughenbaugh*, the Court concluded punitive damages of $750.00 were warranted where $433.50 was taken. 02.4 I.B.C.R. at 164.

Several other cases dealing with repossessed vehicles are helpful to the analysis. For example, in *Meeks*, punitive damages of $35,000.00 were imposed where actual damages consisted of less than $500.00 of lost wages and personal property plus $40.00 per day for car rental. 260 B.R. at 47-48. In *Diviney*, the Tenth Circuit BAP affirmed imposition of $40,000.00 in punitive damages which it

---

[33] *Progressive Motors* observed that *BMW* established "guideposts" of analysis, including the degree of reprehensibility of the defendant's conduct, the ratio of the punitive award to the actual harm, and the comparison of the award to other civil or criminal penalties that might be imposed. *Id.* at 479. It characterized *BMW* as suggesting the ratio to actual damages should not exceed ten to one. *Id.* (citing 517 U.S. at 582). But it further recognized *BMW*'s admonition that there was no precise mathematic formulae, and that "low awards of compensatory damages may properly support a higher ratio." *Id.* (quoting 517 U.S. at 582).

MEMORANDUM OF DECISION - 33

found to be 2.25 times the actual damages.  225 B.R. at 777-78.[34]

Another improper repossession case was *Edmundson v. Arrowood (In re Edmundson)*, No. 02-80193-W, 2002 WL 32389899 (Bankr. D.S.C. July 30, 2002). The actual damages, including fees, amounted to $2,345.95 and the court imposed punitive damages of $7,500.00.  In imposing the punitive damages, the Court stated:

> The automatic stay is one of the most essential and basic protections a debtor has when filing bankruptcy.  To ignore it as blatantly as Defendant has and continues to do in this case merits a serious punitive damages award that will get Defendant's attention, encourage him to change his policy, and deter him from engaging in further erroneous conduct.

*Id.* at *2.

In *Henry v. Assocs. Home Equity Servs., Inc. (In re Henry)*, 266 B.R. 457, 482 (Bankr. C.D. Cal. 2001), another court awarded punitive damages in an amount ten times greater than the actual damages.  Such an approach would support the $10,000.00 requested here as it is roughly ten times the $850.30 in actual damages, exclusive of fees and costs.[35]

True, in *Brockington*, the punitive damages were set at only $500.00.  129 B.R. at 71.  However, this was driven by the fact that the creditor had not received

---

[34] There, the ratio was calculated in reference to actual damages (lost wages and use) plus attorneys' fees.  *See id.* at 768-69, 777.

[35] If, as in *Diviney*, the ratio is calculated in reference to actual damages plus fees and costs, the $10,000.00 of punitive damages sought here is 1.34 times the $7,440.70 ($850.30 plus $6,550.40 in fees/costs).

MEMORANDUM OF DECISION - 34

AO 72A
(Rev. 8/82)

prior written notice of the bankruptcy and voluntarily returned the car the day

following the repossession. *Id.* at 71. That stands in stark contrast to the four

months that passed here before Debtors' improperly repossessed and retained car

was returned. *Jacobson* commented on the timing question:

> To be fair, in cases such as this, the Court considers it appropriate for
> parties to confer through counsel and for the creditor's lawyer to be
> afforded a brief opportunity to research and analyze the law. Deferring
> action on Debtors' request for release of their assets for nine days before
> concluding the request was a proper one, however, does not represent
> the sort of affirmative action required by the [creditor] to demonstrate
> compliance with the Code.

03.2 I.B.C.R. at 120.

### a.  Discount Towing, Hale and Free

The Court finds the conduct here meets the standards for imposition of

punitive damages against Discount Towing and its owners Hale and Free. They

conducted a repossession in the face of Mr. Andrus' advice that he and his wife had

filed for bankruptcy relief. The suggested defense, that Debtors should be required

to corroborate or verify their filing, has been rejected. The course of conduct is not

appropriate and cannot be condoned. This "show me" approach reflects a reckless

and callous disregard for the law. Attempting to place the burden on debtors to

"prove" they are entitled to the protection of the stay is not only "oppressive"

conduct, it is the same sort of "conscious decision to place both the financial

burden and the litigation burden on the Debtors" that was sanctioned in

*Aughenbaugh.* 02.4 I.B.C.R. at 164. Punitive damages are assessed against

MEMORANDUM OF DECISION - 35

Discount Towing, Hale and Free, and awarded to Debtors, in the amount of $2,000.00.

### b.   Johnson, CMI and AMI

The conduct of Johnson, CMI and AMI is, in comparison, even more outrageous. From the commencement of the repossession and continuing thereafter for a period of four months, the creditors thumbed their collective noses at Debtors, Debtors' counsel, and the requirements of the Bankruptcy Code. They ignored the information about the automatic stay made available by Debtors' counsel. They neglected any and all opportunities to determine whether they were indeed on solid legal ground.

The Court concludes that punitive damages are not just warranted, they are absolutely required. Neither these individuals and entities, nor any others dealing with debtors who have filed for relief under Title 11 of the U.S. Code, should be allowed to conduct themselves in such a manner.

Punitive damages are awarded in the amount of $8,000.00. This award is entered against Johnson, CMI and AMI jointly and severally. A higher award was contemplated by the Court, and under the authorities and the record, it could no doubt be justified. However, the Court concludes that it will limit the total punitive award to the amount requested by Debtors.

In connection with Debtors' recovery of this award, the Court concludes, in the exercise of its discretion and based on the entirety of the record, that the

MEMORANDUM OF DECISION - 36

security interest of Johnson and/or CMI in the 2000 Pontiac Grand Am shall be
voided.  It would be ironic indeed if Debtors were to collect actual and punitive
damages from these creditors (which may require further investment of time and
legal expense) only to return some portion in payment on a secured claim under
the chapter 13 plan.  Even paying such creditors under the plan from Debtors' post-
confirmation income, while damage awards remain outstanding, is not particularly
sensible.

The conduct by these creditors as addressed in this Decision is so
objectively unreasonable that forfeiture of the claim is justified.  For example, in
*Meeks*, the court cancelled $11,607.53 of secured debt *in addition to* imposing a
$35,000.00 punitive damage award.  260 B.R. at 46-48.  Here, Creditors fare better
as the cancellation of the lien reduces the balance of the punitive award.

The magnitude of the relief to Debtors from the release of the lien is
$5,690.00 (according to the plan and the pleadings of record).  *See, e.g.*, Doc. No.
61; *see also* Doc. No. 21. and Doc. No. 3.  This leaves $2,310.00 in punitive
damages yet to be collected.  If Johnson and CMI do not cooperate in releasing the
lien on the vehicle, the Court will entertain a supplementary order from Debtors
expunging the lien.

## IV.  CONCLUSION

Debtors established a right to relief under § 362(h).  An order shall be

MEMORANDUM OF DECISION - 37

submitted by Debtors' counsel in accord with the foregoing Decision.[36]

Dated this 23rd day of September, 2004.

TERRY L. MYERS
CHIEF U.S. BANKRUPTCY JUDGE

---

[36] Debtors' counsel shall also submit a revised form of order confirming Debtors' chapter 13 plan so that the same is not inconsistent with this Decision.

MEMORANDUM OF DECISION - 38

CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that I served by the method indicated below, a true copy of the document to which this certificate is attached, to the following named person(s) at the following address(es), on the date shown below:

DATED: September 23, 2004

Case No. 04-00061 (Clinton S. Andrus)

Office of the U.S. Trustee
MK Central Plaza
720 Park Blvd., Suite 220
Boise, ID 83712
jeff.g.howe@usdoj.gov
gary.mcclendon@usdoj.gov
          ☐ U.S. Mail          ☐ Facsimile          ✓ Email

J. Bart Green
GREEN & GREEN
870 N. Linder, Suite B
Meridian, ID 83642
          ✓ U.S. Mail          ☐ Facsimile          ☐ Email

Bernie Rakozy
P.O. Box 1738
Boise, ID 83701
brrakozy@mindspring.com
          ☐ U.S. Mail          ☐ Facsimile          ✓ Email

Martin J. Martelle
Attorney at Law
82 E. State Street, Suite F
Eagle, ID 83616
          ✓ U.S. Mail          ☐ Facsimile          ☐ Email

Todd Gerzine
1223 Talon Ct.
Caldwell, ID 83607
          ✓ U.S. Mail          ☐ Facsimile          ☐ Email


_Jo Ann B. Canderan_
Jo Ann B. Canderan
Judicial Assistant to Judge Myers

Note to Email service: A PDF version of the above decision/order was electronically transmitted to the parties indicated above. Email service is provided as a courtesy only upon request of a party. To review an electronic image of the original of this document, or to subscribe for email service of future decisions/orders from the Bankruptcy Judge, please access the Court's Internet web site, www.id.uscourts.gov.

MEMORANDUM OF DECISION - 39